**E-FILED**
Thursday, 22 December, 2005  04:15:12 PM
Clerk, U.S. District Court, ILCD

### UNITED STATES  DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
#### Urbana Division

| | | |
|---|---|---|
| **LONNELL BREWER,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | |
| **BOARD OF TRUSTEES OF THE** | ) | |
| **UNIVERSITY OF ILLINOIS,** | ) | |
| **KERRIN THOMPSON, in her** | ) | |
| **individual capacity,** | ) | **Case No. 02-2204** |
| **L. DENISE HENDRICKS, in her** | ) | |
| **individual capacity,** | ) | |
| **WALLACE HENDRICKS, in his** | ) | |
| **individual capacity,** | ) | |
| **PETER FEUILLE, in his** | ) | |
| **individual capacity,** | ) | |
| **Defendants.** | ) | |

# O R D E R

In September 2002, Plaintiff, Lonnell Brewer, filed a Complaint (#1) against Defendants Board of Trustees of the University of Illinois, Kerrin Thompson, L. Denise Hendricks, Wallace Hendricks, and Peter Feuille, alleging discrimination in employment and violation of his constitutional and statutory rights in connection with his education.  Federal jurisdiction is based on federal question (28 U.S.C. § 1331).  The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge.

In July 2005, Defendant Board of Trustees (hereinafter "Board") filed a Motion for Summary Judgment (#24).  After reviewing the parties' pleadings and memoranda, this Court **GRANTS** Defendant's Motion for Summary Judgment **(#24)**.

## I.  Background

### A.  Plaintiff's Allegations

Plaintiff alleges that he is an African-American with a learning disability.  At relevant times, Kerrin Thompson was special assistant to the director of the University of Illinois Personnel Services Office (hereinafter "PSO"); Denise Hendricks was assistant vice-president of human resources, associate vice-chancellor for administrative affairs, and director of the PSO;

Peter Feuille was a professor and the director of the Institute of Labor and Industrial Relations (hereinafter "ILIR") at the University of Illinois; and Wallace Hendricks was a professor in the ILIR and Denise Hendricks' husband.

In August 1997, Plaintiff enrolled in the master's degree program at the ILIR.  Beginning August 28, 1997, he worked for the University of Illinois as a research assistant assigned to the PSO.[1]  His assistantship was terminated in April 1998.  On June 18, 1998, he was dismissed from the master's degree program.  (#1, ¶ 24.)

## B.  Procedural Background

Plaintiff's complaint consists of five counts, as follows:  (1) Count I, against all Defendants, alleges race discrimination in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et seq*.); (2) Count II alleges that the Board of Trustees, Thompson, and Denise Hendricks violated the Americans with Disabilities Act (42 U.S.C. § 12101 *et seq.*) (hereinafter "ADA"); (3) Count III alleges that Thompson, Denise Hendricks, Wallace Hendricks, and Feuille violated Plaintiff's constitutional and statutory rights; (4) Count IV, against all Defendants, alleges a violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d, *et seq*.); and (5) Count V, against all Defendants, alleges retaliation.

In its May 2003 Order (#14), the Court dismissed Plaintiff's ADA claim in Count II, the constitutional claim in Count III, and the claims against Kerrin Thompson, Denise Hendricks, Wallace Hendricks, and Peter Feuille in their individual capacities in Counts I, IV, and V.  Thus, the Board is the only Defendant in this case.  The claims remaining in this case include the following:  (1) In Count I, Plaintiff alleges that Defendant Board violated Title VII because

---

[1]The funding for Plaintiff's one-quarter time research assistantship was provided through ILIR as part of a fellowship.  A quarter-time appointment obligates the recipient to work ten hours a week for the project, department, or faculty member to which he is assigned.  Plaintiff was assigned to work at PSO.

The parties have not distinguished between the assignment and the assistantship, often referring to the PSO assignment as "the PSO assistantship."  The Court has generally followed this practice.

Plaintiff was subject to continuous and ongoing acts of race discrimination from supervisors, managers, and faculty; (2) in Count IV, Plaintiff alleges that Defendant violated Title VI because it denied Plaintiff the benefits of participation in the ILIR master's degree program based on his race; and (3) in Count V, Plaintiff alleges that he was subject to adverse actions in retaliation for his complaints to Ron Bacevich, a Labor Relations Specialist in the PSO, and Denise Hendricks regarding discrimination that preceded or occurred in connection with the termination of his employment at the PSO.

### C.  Affidavit of Ronald Bacevich

As an initial matter, Plaintiff's claim of retaliation in Count V is based on the premise that he complained of racial discrimination to Denise Hendricks and Ronald Bacevich.  The Court notes that Plaintiff has stated that he is not offering Mr. Bacevich's statements in Paragraphs 9 to 12 of the affidavit as proof of the matter asserted.  Consistent with this response, the Court must limit its consideration of those statements.  As a result, Plaintiff cannot rely on Bacevich's statements in those paragraphs to support his proposed material facts or to challenge Defendant's proposed material facts.

### II.  Standard of Review

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In ruling on a motion for summary judgment, the Court must decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.  *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  The party seeking summary judgment bears the initial burden of showing that no such issue of material fact exists.  *Celotex,* 477 U.S. at 323.

The Court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  However, the nonmoving party may not rest upon mere allegations in the pleadings or upon conclusory

3

statements in affidavits; rather, he must go beyond the pleadings and support his contentions with proper documentary evidence. *Celotex,* 477 U.S. at 322-23. Pursuant to Rule 56(b), when a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that a genuine issue exists as to any material fact and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A scintilla of evidence in support of the nonmovant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson,* 477 U.S. at 250. The plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* "In such a situation there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.*

### III. Factual Background

The parties disagree about many of the facts in this case. At times, the evidence provided by the parties clears up the dispute; at other times, the dispute is of the "dueling affidavits" variety. Where facts are contested, the Court must accept the factual assertions of the nonmoving party when ruling on a motion for summary judgment. *Pardo v. Hosier,* 946 F.2d 1278, 1280 (7th Cir. 1991). Thus, the following recitation is based on the evidence and, where a dispute exists that the evidence does not resolve, the Court accepts Plaintiff's version of the disputed facts.

### A. Plaintiff's Participation in the ILIR Program

Plaintiff, an African-American, enrolled in the ILIR master's degree program in August 1997. At that time, the program required a student to complete ten units, with each unit being one class. Most students complete the program in a year and a half, taking four units during the first semester and three units during the second and third semesters. Plaintiff wanted to complete the program in one calendar year. As a result, he inquired about the possibility of taking five

4

units in the fall semester.  Although this is an unusual arrangement, Plaintiff persuaded Professor Michael LeRoy, his academic advisor, to approve a five-unit course load.  (LeRoy dep., pp. 97, 16.)  In addition to his class load, Plaintiff worked approximately ten hours at an assistantship, worked at the University's rehabilitation center as its primary speaker, and was interviewing for jobs.

By the end of the fall semester, Plaintiff was falling behind in his course work.  Professor Wallace Hendricks taught one of Plaintiff's courses during the fall semester.  He testified that Plaintiff failed to show up for some lab sessions, which negatively affected Plaintiff's grade. (Hendricks dep., pp. 94, 32.)  In other courses, Plaintiff asked Professor Martocchio for an extension to turn in a paper in December 1997, and he asked Professor LeRoy for extensions to complete final exams in two classes.  (Brewer dep., pp. 51-53; Martocchio dep., p. 17; LeRoy dep., pp. 17, 19.)  Although LeRoy granted the extensions, he informed Plaintiff that he would impose a penalty.  (LeRoy dep., pp. 17, 19.)  Plaintiff eventually completed the paper and turned in the finals by the extended due dates.

At the end of the fall semester, Plaintiff's grade point average (hereinafter "GPA") was 2.866.  As a result, in keeping with ILIR policy, Plaintiff was considered to be on limited status. In January 1998, Professor LeRoy, in his capacity as chairman of the On-Campus Committee (hereinafter "Committee"), sent Plaintiff a letter stating, in pertinent part, as follows:

> The On-Campus Committee has reviewed Fall 1997 semester grades.  After completing five units, your grade point average is 2.866 . . . .  Since this is below the required minimum of 3.00 on a 4.00 scale you will be placed on limited status. To regain full graduate standing and be eligible to receive the master's degree you must raise your cumulative grade point average.  Specifically, you must raise your cumulative GPA to at least a 3.00 by the end of the Spring 1998 semester.  Your GPA will be calculated on LIR courses taken since you began the LIR master's program in Fall 1997.  Failure to achieve this minimum likely will result in your being dropped from the LIR graduate program.

(LeRoy letter to Pl., dated January 23, 1998.)  Professor LeRoy also advised Plaintiff to take only three units during the Spring 1998 semester.

5

During the spring semester, Plaintiff enrolled in three classes.  After the spring semester, Plaintiff's cumulative GPA was 2.959, below the 3.0 GPA required by the ILIR and the Graduate School and specified in the Committee's letter.

According to the ILIR handbook and procedure, when a student's academic standing is at issue, the Committee will consider whether to retain or dismiss the student from the ILIR program.  (ILIR Handbook, p. 11.)  The Committee will then offer a recommendation to Professor Feuille, the ILIR director, who makes the final decision.  (LeRoy dep., pp. 58, 85; Hendricks dep., p. 67.)  Generally, Professor Feuille is not involved in the Committee's decision-making process.  (LeRoy dep., pp. 33, 58; Feuille dep., pp. 13-14.)

 After the spring semester, Plaintiff's cumulative GPA of 2.959 triggered the Committee's review process.  Pursuant to ILIR procedures, the Committee considered whether to retain or dismiss Plaintiff from the program.  At that time, the Committee consisted of Professor LeRoy, Elissa Perry, Professor Martocchio, and Gregory Northcraft.  (LeRoy dep., p. 35.)  On June 1, 1998, Professor LeRoy informed the Committee that Plaintiff's cumulative GPA was below 3.0, described the January 1998 letter the Committee had sent to Plaintiff and ILIR Policy, and then stated as follows:

> To this, I would add my personal observation.  Lonnie not only lacks mitigating circumstances, but in fact, presents aggravating circumstances in the form of dismissal from a graduate assistant job.  This is extremely rare, and says something about his work standards . . . .  I would also add that this proposed action [(to dismiss him from the ILIR program)] is consistent with ILIR's previous cases that present similar facts (and these lacked the aggravating factor).

(Email message to Committee, dated June 1, 1998.)  Professor Feuille subsequently decided to dismiss Plaintiff from the ILIR program.

Professor Martocchio testified that a student's performance in his assistantship would, in general, be completely independent from academic performance, and he did not consider the PSO assistantship a factor in his decision to recommend dismissing Plaintiff from the master's

6

degree program.  (Martocchio dep., pp. 34-35.)  He also testified that the only factor that he considered in making his decision was Plaintiff's academic status.  (Martocchio dep., pp. 40-41.)

The evidence of the email discussion among the Committee members indicates that no one spoke in favor of retaining Plaintiff in the program.  In his journal, Plaintiff stated that Professor LeRoy told him the Committee had originally voted to retain him and Professor Feuille intervened and told the Committee to recommend dismissal.  (Brewer ex., #25, p. 25.)  Plaintiff's testimony regarding what Professor LeRoy told him does not raise a material issue as to what the Committee formally recommended.  We accept as true Plaintiff's statement that LeRoy told Plaintiff that Feuille had intervened in the process.  Nevertheless, even if LeRoy's statement to Plaintiff accurately characterized the process by which the Committee reached its ultimate decision to recommend dismissal, this does not affect the analysis.  It is undisputed that the Committee officially recommended dismissal.  Furthermore, whether Feuille decided to dismiss Plaintiff from the program by affirming the Committee's recommendation or by intervening at an earlier stage, both parties agree that Feuille was the final decision-maker.

On June 18, 1998, Plaintiff received a letter from Professor Feuille, informing him that ILIR had dropped him from the graduate program.  (Brewer ex., #25, p. 25.)  On September 3, 1998, he received another copy of the letter confirming his dismissal from the program. (Brewer ex., #25, pp. 1-2.)  The letter stated that he had been dismissed because his GPA did not satisfy ILIR requirements and also explained the process for appeal.  Plaintiff did not appeal Feuille's decision.

Professor Feuille testified that Plaintiff was dismissed from the program based on his failure to achieve the required GPA.  Feuille did not consider the assistantship at all in deciding to dismiss Plaintiff.  Feuille testified as follows:  "I made the decision to dismiss him from the program because he had been pointedly informed in January that he was on academic probation. He had one semester to remove himself.  He was told what the target he needed to meet was and

7

he failed to meet it.  And he was told what the consequences would be."  (Feuille dep., pp. 39-
40.)  Feuille also testified as follows:  "He was below 3.0, and . . . he had been told, all right, you
got to get your cumulative GPA up to this particular level.  He didn't.  And he had been told
what the consequence would be if he didn't.  And it was a very straightforward decision made on
that basis."  (Feuille dep., p. 42.)

It is undisputed that ILIR policy is to "drop from the master's program those students
who do not achieve at least a 3.0 GPA after two semesters" and that exceptions to this rule "will
be made only in extraordinarily compelling academic circumstances."  (ILIR Handbook, p. 11,
attached to Leroy's dep. as Ex. 6.)  The ILIR Handbook addresses academic standing as follows:

> Students . . . whose first semester GPA falls below a 3.0 will have their records
> carefully scrutinized by the On-Campus Committee ("Committee").  The
> Committee may recommend to the Director the immediate dismissal of students
> whose first semester performance is seriously deficient.  The Committee may
> decide that other students will be allowed to continue in the program for a second
> semester.  If so, the Committee will inform these students, in writing, that they
> will be allowed to continue in the program under the following conditions:
> (1) they will remain on limited status, (2) they should be enrolled on a full-time
> basis [(footnote omitted)]; (3) they must bring their GPA up to at least a 3.0 by
> the completion of their second semester, and (4) they will be dropped from the
> program if they fail to achieve this 3.0 GPA standard after two semesters . . . .
> The Committee will carefully scrutinize the records of such students immediately
> after their second semester.  Those students who fail to meet the Committee's
> condition(s) will be recommended to the Director for dismissal from the master's
> program.  The intent of this paragraph is to drop from the master's program those
> students who do not achieve at least a 3.0 GPA after two semesters.  Exceptions
> to this rule will be made only in extraordinarily compelling academic
> circumstances.
>
> . . . .
>
> Students who wish to appeal their dismissal must petition the Director, in writing,
> for readmission.

(ILIR Handbook, pp. 11-12.)

Feuille has been ILIR director since 1994.  During that time, Feuille testified that he
could not think of any time when the Committee recommended retaining a student who had a

8

GPA less than 3.0 after two semesters.  (Feuille dep., p. 32.)  He remembered one occasion where a student with a GPA of less than 3.0 was ultimately allowed to return to ILIR.  On that occasion, he first agreed with the Committee's recommendation to dismiss the student because her GPA was below 3.0 at the end of two semesters.  (Feuille dep., p. 35.)  The student appealed the dismissal, and as a result of the appeal, Feuille learned that she had followed incorrect advice from a faculty member.  (Feuille dep., p. 34-35.)  Because her failure to achieve a 3.0 was the result of her reliance on the mistaken advice of a faculty member, he rescinded her dismissal and allowed her to return to the ILIR program.

### B.  Plaintiff's Assistantship

In conjunction with his enrollment in the ILIR master's degree program, Plaintiff was offered a one-quarter time research assistantship.  He was assigned to work at the PSO.  Denise Hendricks was director of the PSO at the time and Kerrin Thompson was special assistant to Hendricks.  Thompson was Plaintiff's supervisor in terms of his hours and overall assignments; however, he worked on different projects during his assistantship and various people supervised the particular projects.

In October 1997, Plaintiff brought his fiancée, a Caucasian, to the PSO to meet some of his coworkers.  He stated in his journal that Thompson "seemed surprised at the race of my fiancee and her posture became noticeably and increasingly hostile afterwards."  (Brewer ex., #25, p. 5.)  Elyne Cole, a PSO employee who is African-American, testified that she observed that Thompson had a good opinion of Plaintiff and she did not observe any negative attitude or change in Thompson's attitude toward Plaintiff at any time up to the time of his discharge.  (Cole dep., pp. 18-22.)

During the fall semester, Plaintiff worked primarily on one assignment.  He testified that he was allowed to schedule his hours and his own deadline for completion of the project.  He was unable to complete the project by his chosen deadline and asked for an extension until the

9

following Monday.  When he informed Judy Baker, his supervisor on the project the he could

not complete it as planned, she told him that he could turn it in on Monday and that

Denise Hendricks and Kerrin Thompson wanted to meet with him.  (Brewer ex., #25, p. 8.)  He

was able to complete the project by Monday.  Both Thompson and Hendricks were unhappy that

he had not met his initial deadline and as a result, each of them met separately with Plaintiff to

discuss his performance.  Hendricks spoke to him regarding problems with attendance and

failure to meet deadlines.  (Hendricks dep., pp. 20-21.)  After Hendricks looked at Plaintiff's

completed project, she told him that she was very happy with it and that she may have acted a bit

too hastily in her previous criticism of him for turning the project in late.  (Plaintiff dep., pp.

60-61.)


At some point during the fall semester, Hendricks spoke to Professor Feuille or

Susan Sands, the assistant director at ILIR, about Plaintiff's performance.  Sands offered to

switch Plaintiff to another assignment for the remainder of his assistantship.  (Hendricks dep.,

pp. 20-21.)  Hendricks wanted Plaintiff to continue at the PSO, provided he could meet PSO's

expectations.  (Hendricks dep., p. 21.)  Feuille subsequently sent Plaintiff a letter dated

January 23, 1998, in which he stated that Plaintiff's PSO supervisors had "indicated that 'your

[Plaintiff's] approach to your job duties lacked commitment and a professional attitude toward

the timely completion of your assigned work.' " (Feuille letter to Pl. dated January 23, 1998.)

Professor LeRoy also referred to his performance in his January 23, 1998, letter to Plaintiff on

behalf of the Committee, in which he stated:  "I also had reports of sub-par performance from

faculty and supervisory staff from the campus Personnel Services Office."  (LeRoy letter to

Plaintiff dated January 23, 1998.)


Plaintiff testified that he had no more conversations with anyone at PSO regarding his job

performance until the day Denise Hendricks terminated his assignment at the PSO.  (Brewer

dep., pp. 62-63.)

In April 1998, a problem arose related to Plaintiff's parking tag.  Plaintiff testified that when he first began his assistantship, Thompson gave him a parking tag and told him he could use it to park either at the PSO or at the ILIR building when he was doing work there for the PSO.  (Brewer dep., pp. 65-67.)  A parking tag lists the code for the parking lot in which the tagholder is authorized to park.  E7 is apparently the code for the PSO lot and C8 is the code for the ILIR parking lot.  (Hendricks dep., pp. 50-52.)  Plaintiff testified that he did not write "E7" on the tag, and he "may have written the C8" but he was not sure.  (Brewer dep., pp. 66-67.)  Alternatively, Plaintiff admitted that he did write one of the lot numbers on the tag, consistent with Thompson's instructions.  (Brewer ex., #25, p. 17.)  Regardless of whether Plaintiff or someone else wrote C8 on the tag, Plaintiff asserts that this was consistent with the instructions Thompson had given him regarding which lots he was allowed to park in.

At some point, the parking tag tore so it would not hang on Plaintiff's mirror.  Plaintiff tried laying it on the dashboard, but he received a ticket.  Plaintiff then took his tag to Parking Services to get a replacement.  Parking Services observed that Plaintiff's tag listed two lots, E7 and C8.  Parking Services informed him that he should not have a tag to park in the ILIR lot and they would check the application to figure out where he was authorized to park.  (Brewer dep., p. 68.)

Parking Services subsequently called the PSO and spoke to Thompson.  Thompson testified that Parking Services was concerned because the parking tag had two lot numbers written on it; one that they knew they had authorized, and one that they did not think they had authorized.  (Thompson dep., p. 27.)  She testified that she told Denise Hendricks what Parking Services had told her; that Plaintiff had filled in another lot number on the parking tag.  Specifically, Thompson told Hendricks that she "had received a call from parking services that . . . one of our hang tags had been altered to allow Lonnie to park in another lot." (Thompson dep., p. 29.)  Elyne Cole testified that she heard Thompson tell Denise that Parking Services said the parking tag had been altered.  (Cole dep., p. 21.)

11

A few days before April 21, 1998, Plaintiff went to work at PSO and met with Thompson.  (Brewer dep., pp. 74.)  He testified as follows:

> Kerrin [Thompson] asked me to come into her office, she was irate.  She was irate because of the – the issue with the tag because I wrote C8 on it.  And she explained to me that I wasn't supposed to have the tag at all and that she had gone on a limb and basically falsified the information on the application so that I could have a tag.  So she was like very upset and she was being very belligerent I would call it and inappropriate in both her tone and what she was saying to me.
>
> So at one point I finally – I stood up . . . and . . . I asked her, you know, not to speak to me like I'm some kind of child.  And, you know, she got even more upset that I was pushing back and under her breath mumbled a couple things, and I said, you know, what did you say?
>
> And so then eventually I said, look, I don't have to take this, and I started to walk off.  And she called me a n---- as I was walking out the door, and I turned back around, and asked her to repeat what she said.  And she, you know, didn't repeat that specifically but said, you know, a few other things, and then I felt like, you know, it was time to walk out of the office.  And she said something to the effect of, you know, get out of here and – I don't even remember exactly what else she said.

(Brewer dep., pp. 75-76.)  In addition, Plaintiff stated in his journal that Thompson said to him, "I am through with you people."  (Brewer ex., # 25, p. 18.)


The same afternoon, Plaintiff met with Denise Hendricks and Hendricks informed him that she was terminating his assistantship effective April 21, 1998.  Regarding that meeting, Plaintiff testified as follows:

> [At that meeting,] she officially, you know, terminated me and explained that she really didn't feel like this was – this issue merited termination, but that she had a relationship with the . . . parking services and that, you know, she was afraid that she would lose her parking flexibility if somebody didn't you know, in effect pay for this.

(Brewer dep., p. 77.)  Plaintiff also stated that he told her about his conversation with Thompson and Hendricks told him that was something he would have to work out with Thompson.  (Brewer dep., p. 78.)  In his journal, Plaintiff stated that, during this meeting, he told her, "I understand that what I did was wrong.  However, I do not understand why I am being treated this way. Kerrin gave me the tag and told me to park."  (Brewer ex., #25, p. 20.)  He realized that Hendricks "simply wanted [him] out" when she said, "you admitted to altering the temporary

parking tag, so I did not need to know much more."  (Brewer ex., #25, p. 20.)  He also said that Hendricks told him she needed to protect her relationship with Parking Services.  (Brewer ex., #25, p. 20.)

Hendricks testified that Plaintiff was permitted to park in the PSO lot which was immediately adjacent to the PSO office and Thompson did not have the authority to tell him to add the code for the ILIR lot to the parking tag.  (Hendricks dep., pp. 51, 49.)  PSO had temporary tags that they could give to people for various purposes; however, they were limited to use in the PSO lot.  (Hendricks dep., p. 53.)  Hendricks is not aware of any occasions on which she or anyone in the PSO office provided temporary tags to allow people to park anywhere except the PSO lot.  (Hendricks dep., p. 53.)  Ronald Bacevich stated in his affidavit that during 1997-98, the PSO had one or more parking tags that authorized parking in lots other than the PSO lot, including the ILIR lot.  He knew this because he used one on a regular basis.  (Bacevich aff., ¶ 13.)

Hendricks testified that she terminated the assistantship solely because Plaintiff falsified a parking tag.  (Hendricks dep., p. 35.)  She did not contact Plaintiff to get his side of the story and she did not do any independent checking before deciding to terminate Plaintiff's assistantship.  (Hendricks dep., pp. 37-38.)  She based her conclusion that Plaintiff had falsified the tag on her visual inspection of the tag and the information that Thompson relayed to her from Parking Services.  (Hendricks dep., pp. 35-36.)  She stated that Thompson told her that Plaintiff had taken his tag to Parking Services to get it replaced; Parking Services saw that it had been marked to add another parking lot in addition to the lot that was printed on the hang tag; and Parking Services then contacted PSO to find out why Plaintiff's tag listed two parking lots. (Hendricks dep., p. 36.)

Regarding the information Thompson provided, Hendricks stated she had no reason to question what Thompson told her.  Specifically, regarding her relationship with Thompson,

13

Hendricks stated as follows:  "She is my assistant.  She is basically, does part of my job for

me . . . .  And in certain instances, and represents me.  So, I would have no reason to question

what she says."  (Hendricks dep., p. 38.)  At some point, Hendricks told Susans Sands about the

issue.  (Hendricks dep., p. 40.)  Sands asked her if she wanted to continue or terminate Plaintiff's

assistantship.  (Hendricks dep., p. 70.)

Hendricks was the only person who participated in the termination decision.  (Hendricks

dep., p. 35.)  She did not talk to Thompson about whether to discharge Plaintiff.  (Hendricks

dep., p. 39.)  The only person she discussed the issue with was Susan Sands.  When asked

whether she would have changed the outcome for Plaintiff in terms of his termination if she

became aware that Thompson had made racist remarks, Denise Hendricks stated that the remarks

did not make him change the parking tag, therefore she would not have taken the remarks into

consideration when making the decision whether to terminate Plaintiff's assistantship.

(Hendricks dep., pp. 67-68.)

Professor Feuille was aware that Denise Hendricks had terminated Plaintiff's assignment

at PSO.  On about April 22, 1998, Professor Feuille and Susan Sands met with Plaintiff.  At the

meeting, Feuille informed Plaintiff that the ILIR was terminating Plaintiff's assistantship.  He

gave Plaintiff a letter that stated, in pertinent part, as follows:

> We have been informed by PSO that your work-related behaviors have fallen
> substantially short of their expectations.  Indeed, the PSO administrators are so
> disappointed in your behavior that, effective April 21, 1998, PSO is no longer
> willing to have you work for them.
>
> As you recall, this is not the first time your PSO superiors have been disappointed
> in your RA work.  As I stated in my January 23, 1998 letter to you, your PSO
> supervisors indicated that "your approach to your job duties lacked commitment
> and a professional attitude toward the timely completion of your assigned work."
>
> As a result of PSO's termination of your RA work assignment, the Institute of
> Labor and Industrial Relations is terminating and canceling your Research
> Assistantship for the balance of the Spring 1998 Semester, effective April 21,
> 1998.  Among other things, this means that you will not be paid after this April 21
> date.

14

> The words in this letter cannot fully convey how greatly disappointed, dismayed, and upset we are with your performance. ILIR has worked for many years to establish and maintain a strong relationship with PSO. This relationship has resulted in an annual RA position that has enabled several of your predecessors to obtain the financial aid necessary to pursue a graduate education, as well as provide them with the opportunity to obtain some professionally relevant and valuable work experience. However, with your unacceptable behaviors you have placed this strong relationship in jeopardy, to the possible detriment of the students who will follow you into our program.

(Feuille letter to Plaintiff, dated April 21, 1998.)

## IV.  Analysis

Defendant Board argues that the Court should grant summary judgment in its favor because Plaintiff has failed to establish, by either the direct or the indirect method, that Defendant discriminated against him in his employment or in his participation in the master's degree program. In addition, Defendant reiterates its argument that the Court should dismiss Plaintiff's Title VII and Title VI claims on the grounds that they were untimely based on applicable statutes of limitations.

### A.  Analysis Regarding the Statute of Limitations Argument

In its motion to dismiss (#6), Defendant argued that the applicable statutes of limitations barred the Title VII claims in Counts I and V, the Title VI claim in Count IV, and the constitutional claim in Count III. Plaintiff did not challenge Defendant's statute of limitations argument regarding the constitutional claim, and the Court dismissed that claim. (Order, #14.) When ruling on the motion to dismiss, the Court did not address the statute of limitations arguments for the Title VII and Title VI claims. The Court will now consider these arguments.

#### 1.  Statute of Limitations for the Title VI Claim

The parties disagree as to the applicable statute of limitations for a Title VI claim. Plaintiff contends that the statute of limitations is five years, consistent with the Seventh

Circuit's decision in *Beard v. Robinson*, 563 F.2d 331, 338 (7th Cir. 1977) (holding that a five-year statute of limitations applies to statutory claims brought under the Civil Rights Act of 1991 (42 U.S.C. § 1981)). Defendant argues that the limitations period is two years, based on the Illinois statute of limitations for personal injury claims.

Defendant contends that the Seventh Circuit partially overruled *Beard* in *Kalimara v. Illinois Department of Corrections*, 879 F.2d 276 (7th Cir. 1989), and *Porter v. United States GSA*, 151 F.3d 1033, 1998 WL 516785 (7th Cir. 1998). Neither *Kalimara* nor *Porter* involve a Title VI claim. Defendant also cites *Torrespico v. Columbia College*, 97 C 8881, 1998 WL 703540, *11 (N.D. Ill. Sept. 30, 1998) (unreported) (stating that Title VI claim was probably subject to a five-year statute of limitations).

In support of its argument that Illinois' two-year statute of limitations for personal injury should be applied to Title VI claims, Defendant also relies in part on *Wilson v. Garcia*, 471 U.S. 261 (1985), in which the United States Supreme Court held that a state should apply its limitations period for personal injury actions to claims brought pursuant to Section 1983 (42 U.S.C. § 1983). In *Allen v. Board of Governors of State Colleges and Universities*, the Northern District court declined to apply the reasoning in *Wilson* to the Title VI context. *Allen v. Bd. of Governors of State Colls. and Univs.*, No. 93 C 380, 1993 WL 69674, *2 (N.D. Ill. Mar. 11, 1993) (unreported). Instead, the Northern District court applied a five-year limitations period to a Title VI claim. *Id.* (citing *Lewis v. Russe,* 713 F. Supp. 1227, 1232 (N.D. Ill. 1989)). This Court finds persuasive the Northern District court's reasoning rejecting *Wilson* and applying a five-year limitations period for Title VI claims. Therefore, the Court will apply that limitations period. *See id.*

Here, Plaintiff received a letter from ILIR on June 18, 1998, informing him that ILIR had dropped him from the graduate program. (Brewer ex., #25, p. 25.) He filed his complaint in this case on September 26, 2002, less than five years later. Based on a five-year limitations period

for a Title VI claim, Plaintiff timely filed his claim.  Accordingly, the statute of limitations does not bar the claim.

## 2.  Statute of Limitations for the Title VII Claim

The parties agree that, generally, a plaintiff must file his claim within ninety days after receiving a right-to-sue letter from the Equal Employment Opportunity Commission (hereinafter "EEOC").  Plaintiff received his letter on March 19, 2002, and filed suit *in state court* within the limitations period.  When the state court dismissed his claim for lack of jurisdiction, Plaintiff filed this suit in federal court on September 26, 2002, after the expiration of the ninety-day period.

Defendant concedes that, if Illinois courts have concurrent jurisdiction with federal courts over Title VII claims, then Plaintiff's filing of his state court suit would toll the statute of limitations as to the federal court suit.  However, Defendant argues that Illinois courts do not have concurrent jurisdiction; instead, Section 8-111(C) of the Illinois Human Rights Act vests the Illinois Department of Human Rights Commission with exclusive jurisdiction over cases involving civil rights violations, including Title VII cases.  *See* 775 ILCS 5/8-111(C) (West 2000).  On this basis, the Illinois appellate court affirmed the circuit court's dismissal of the case that Plaintiff filed in state court.  *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 791 N.E.2d 657, 664 (Ill. App. Ct. 2003).  That court's decision explains its reasoning.

Plaintiff contends that the Seventh Circuit has rejected the argument that Illinois courts do not have jurisdiction over Title VII claims, and relies on the Seventh Circuit court's decision in *Yellow Freight v. Donnelly*, 874 F.2d 402 (7th Cir. 1989).  In *Yellow Freight*, the court stated as follows:

> Yellow Freight argues that, at least in Illinois, state courts do not provide a forum
> for Title VII litigation and therefore jurisdiction lies exclusively with the federal
> courts.  We must reject this argument.  Even if the *Mein* [*v. Masonite Corp.*, 485
> N.E.2d 312, 315 (Ill. 1985)] court did, in fact, intend to exclude Title VII claims

17

> from the Illinois courts [(footnote omitted)], neither the Illinois courts nor
> legislature have the power to close state court doors to federal causes of action.
> When presented with a federal claim over which concurrent jurisdiction exists,
> state courts are under a 'duty to exercise (jurisdiction)' over the federal claim . . . .
> Once Congress has vested jurisdiction over a federal claim in the state courts, the
> state courts, including the courts of Illinois, are under a constitutional obligation
> to exercise jurisdiction.

*Yellow Freight*, 874 F.2d at 409.  In addition, the *Yellow Freight* decision expressly overruled *Brown v. Reliable Sheet Metal Works*, in which the Seventh Circuit court had held that the filing of a complaint in state court did not toll the Title VII ninety-day filing period because the plaintiff did not exhaust her state administrative remedies.  *See Brown v. Reliable Sheet Metal Works, Inc.*, 852 F.2d 932, 934-35 (7th Cir. 1988).  In *Yellow Freight*, the Seventh Circuit court held that the plaintiff's failure to exhaust her state administrative remedies did not defeat the tolling effect of her state court filing on Title VII's ninety-day window.  *Yellow Freight*, 874 F.2d at 410.  The court stated, "[b]ecause we find that jurisdiction over Title VII claims is *vested in both state and federal court*, we reject Yellow Freight's argument that the state court filing did not toll the 90-day statute of limitations." *Id*. (emphasis added).  This Court is bound by Seventh Circuit precedent.  Accordingly, the Court concludes that Plaintiff's filing of a complaint in state court tolled the statute of limitations for Plaintiff's Title VII claim and he timely filed his suit in federal court.

In the alternative, Plaintiff also argues that if the Court determines that the filing of the state court case did not toll the statute of limitations for filing this case, the Court should apply the doctrine of equitable tolling.  The Court agrees that this doctrine provides an alternative mechanism for tolling the statute of limitations.  The Seventh Circuit Court has stated that the ninety-day period of limitations in Title VII actions may be equitably tolled when circumstances warrant.  *Jones v. Madison Serv. Corp*., 744 F.2d 1309, 1314 (7th Cir. 1984) (citing *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393 (1982)).  "Equitable tolling is to be restricted and reserved only for situations in which the claimant has made a good faith error (e.g., brought suit in the wrong court) or has been prevented in some extraordinary way from filing his complaint in

time." *Jones*, 744 F.2d at 1314 (citing *Smith v. Am. President Lines, Ltd.,* 571 F.2d 102, 109 (2d Cir. 1978)).

Here, to the extent that Plaintiff's filing in state court constitutes an error, it was a "good faith error" as the Seventh Circuit defined that phrase in *Jones*. Accordingly, the Court concludes that the statute of limitations does not bar Plaintiff's Title VII claim.

## B.  Analysis Regarding the Title VII Claim (Count I)

Title VII makes it unlawful for an employer to discriminate against an individual in his employment based on that person's race. 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove discrimination by presenting direct or circumstantial evidence of intentional discrimination, or he may proceed under the burden-shifting method established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-03 (1973). *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 831-32 (7th Cir. 2005).

Plaintiff's claim in Count I alleges that Defendant violated Title VII by terminating Plaintiff's assistantship because of his race. Defendant argues that the Court should grant summary judgment in its favor on the Title VII claim in Count I for the following reasons: Regarding the direct method, (1) Thompson did not make the alleged racist comments; (2) even if Thompson did make the comments, it does not constitute direct evidence of discrimination because she was not the primary decision-maker regarding the termination of Plaintiff's assistantship; and (3) the race-related comments by Denise Hendricks, Feuille, and Wallace Professor Hendricks do not constitute direct evidence of discrimination. Under the indirect method, (4) Plaintiff cannot prove his *prima facie* case because he failed to satisfy legitimate performance expectations; (5) Plaintiff failed to identify a similarly-situated person who was treated more favorably; and (6) Plaintiff has failed to establish pretext.

19

### 1. Direct Evidence

To prove discrimination using direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." *Jordan*, 396 F.3d at 832 (quoting *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 616 (7th Cir. 2000)).  Such admissions rarely occur.  *Radue*, 219 F.3d at 616.  Therefore, a plaintiff may also defeat summary judgment under the direct method of proof by constructing a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decision-maker." *Rhodes v. Ill. Dep't of Transp.,* 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 737 (7th Cir. 1994)).  Circumstantial evidence may come in the form of "suspicious timing, ambiguous statements oral or written, [or] behavior toward or comments directed at other employees in the protected group . . ." *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 272-73 (7th Cir. 2004) (quoting *Troupe*, 20 F.3d at 736).  Nevertheless, even circumstantial evidence must point directly to a discriminatory reason for the employer's action. *Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir. 2003); *Chiaramonte v. Fashion Bed Group, Inc., a Div. of Leggett & Platt, Inc.*, 129 F.3d 391, 396 (7th Cir. 1997) (under the direct method, the plaintiff must produce evidence that relates to the motivation of the decision-maker responsible for the contested decision).

Plaintiff asserts that he has presented direct evidence of discrimination based on Thompson's and Denise Hendricks' comments, along with the facts that no other African-American ever received the PSO assistantship and that Plaintiff was the only student who was alleged to have performance issues or whose assistantship assignment was terminated.

Regarding Thompson, the parties dispute whether Thompson made the comments at issue.  Therefore, the Court accepts as true Plaintiff's version.  *See Pardo,* 946 F.2d at 1280 (where facts are contested, the court accepts plaintiff's factual assertions when ruling on a motion for summary judgment).  According to Plaintiff, Thompson questioned him about his engagement to a Caucasian woman.  In addition, during the discussion between Plaintiff and

20

Thompson regarding the parking tag, Thompson referred to Plaintiff using a racial epithet and she stated, "I am through with you people." (Brewer ex., #25, p. 18.) Plaintiff also testified that Elyne Cole, a PSO employee, told him that Thompson did not like Black people and that she had heard Thompson make disparaging stereotypical comments about Plaintiff to Hendricks, such as references to his lack of urgency around work. (Brewer dep., pp. 29-30, 31.) Based on this evidence, a reasonable jury could conclude that Thompson was biased against Plaintiff because of his race.

According to Plaintiff, Hendricks' race-related comments include the following: (1) In her deposition, Denise Hendricks stated that Plaintiff was the only African-American who held the ILIR assistantship during the entire history of the program and the only student whose assistantship was terminated (D. Hendricks dep., pp. 55, 57-58); (2) Denise repeatedly referred to the fact that Plaintiff was the first African-American male to hold the PSO assistantship (Brewer dep., pp. 84-86); (3) at the end of the first semester when Denise was discussing issues of concern with Plaintiff, she stated that he was the first African-American to hold the PSO assistantship (Brewer ex., #25, p. 9); and (4) Denise told Plaintiff that she "was excited to have a minority" in the assistantship (Brewer ex., #25, p. 9). These race-related remarks were uniformly positive or factual statements. A reference to race does not automatically constitute evidence of racial animus or *discrimination* based on race. Moreover, these comments were wholly unrelated to Hendricks' decision to terminate Plaintiff's assignment.

Although Plaintiff refers to these statements in his discussion regarding direct evidence, he does not, in fact, argue that they constitute direct evidence of *discrimination*; instead, he asserts that they suggest that Plaintiff was subject to heightened scrutiny because he was the first African-American to hold the PSO assistantship. The fact that an individual may be subject to heightened scrutiny because of his race or that African-Americans may be treated as a separate subgroup based on their race does not constitute direct evidence of discrimination based on race. *See Phaup v. Pepsi-Cola Gen. Bottlers, Inc.*, 761 F. Supp. 555, 564 (N.D. Ill. 1991) (in the Title VII context, concluding that certain statements that were benign or unrelated to layoffs did not

21

constitute direct evidence of discrimination, but might, in conjunction with other evidence, be considered evidence of pretext).

In addition, Plaintiff contends that no other African-American was ever granted the PSO assistantship, either before or after it was given to Plaintiff, and that Plaintiff was the only student who was alleged to have performance issues or whose assistantship was terminated. This evidence is not related to the motivation of the decision-maker, therefore, it does not constitute direct evidence of discrimination. *See Chiaramonte*, 129 F.3d at 396 (direct evidence "must relate to the motivation of the decision-maker responsible for the contested decision").

Plaintiff primary argument seems to be that "Thompson's and Hendricks [(*sic*)] involvement with the decision [to terminate Plaintiff's assistantship], coupled with the fact that Thompson's most egregious racial remarks were made in conjunction with the termination decision" (#26, p. 33) constitutes direct evidence of racial discrimination.

Assuming Thompson was biased against Plaintiff because of his race, Thompson's bias does not constitute *direct* evidence that Hendricks' decision to terminate Plaintiff's PSO assignment was based on race. The Seventh Circuit has stated that the prejudices of an employee, normally a subordinate, may be imputed to the employee who has formal authority over the plaintiff's job "where the subordinate, by concealing relevant information from the decisionmaking employee or feeding false information to him, is able to influence the decision." *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400 (7th Cir. 1997); *Cowan v. Glenbrook Sec. Servs., Inc.*,123 F.3d 438, 443 (7th Cir. 1997) (stating that prejudice on the part of an employee may be imputed to a decision-maker if the employee, by feeding false information, was able to influence the decision). Thus, Thompson's bias might be imputed to Hendricks if she gave Hendricks false information or concealed relevant information such that a nexus exists between Thompson's bias and Hendricks' decision. *See e.g., Porter v. Ill. Dep't of Children and Family Servs.*, 987 F. Supp. 667, 673 (N.D. Ill. 1997), *aff'd*, 165 F.3d 32 (7th Cir. 1998) (stating

22

that an admission of bias is material only if it is related to the employment decision in question). The Court will consider whether the evidence shows that Thompson's bias should be imputed to Hendricks' decision, either because Thompson gave Hendricks false information or because she concealed relevant information.

Plaintiff has provided no evidence to support the premise that Thompson gave Hendricks false information regarding the parking tag. Instead, the evidence shows that Thompson simply passed on information that Parking Services had given her. Thompson testified that she told Denise Hendricks what Parking Services had told her. Specifically, Thompson testified that she told Hendricks that she "had received a call from parking services that . . . one of our hang tags had been altered to allow Lonnie to park in another lot." (Thompson dep., p. 29.) Hendricks testified that Thompson told her that Plaintiff had taken his tag to Parking Services to get it replaced; Parking Services saw that it had been marked to add another parking lot in addition to the lot that was printed on the hang tag; and Parking Services then contacted PSO to find out why he had two parking lots listed on his tag. (Hendricks dep., p. 36.)

Thus, although it is true that the Hendricks' information about the parking tag came from Parking Services *via* Thompson, here, Thompson simply relayed the information to Hendricks. In contrast, cases where courts have imputed discriminatory animus of another employee to the decision-maker involve a greater degree of influence by the subordinate. For example, in *Shager v. Upjohn Company*, the court denied summary judgment for the employer because the facts showed that Lehnst, the non-decisionmaking employee, set up the plaintiff to fail by assigning him an unpromising territory and subsequently influenced the committee that made the decision by portraying the plaintiff's performance "in the worst possible light." *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990). The court reversed the district court's grant of summary judgment for the employer, noting that Lehnst's influence may well have been decisive and that if the committee acted as a conduit for Lehnst's prejudice, then the employer would be liable even if the committee was not aware of Lehnst's prejudice. *Id.* Similarly, in *Gusman v. Unisys Corporation*, the plaintiff's immediate supervisor, Troudt, exhibited overt age bias, and the

23

plaintiff was discharged *as a result* of Troudt's recommendation.  The court stated that reasonable jurors could conclude that Troudt lied to his superiors about the plaintiff's skills, ensuring that they would approve his recommendation.  In affirming the jury verdict in favor of the plaintiff-employee, the court stated, "[a]n employer cannot escape responsibility for wilful discrimination by multiple layers of paper review, when the facts on which the reviewers rely have been filtered by a manager determined to purge the labor force of older workers."  *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1147 (7th Cir. 1993) (citing *Shager*, 913 F.2d at 405).

In these cases, the biased employee did more than pass on information from a third party; his or her role was more significant and involved some evaluation or assessment of the discharged employment, such as a direct recommendation (*Gusman*), or lying about the plaintiff's skills and portraying his performance in the "worst possible light" (*Shager*).  In contrast, courts have granted summary judgment to employers in cases where the employee's role is more neutral or where the plaintiff fails to demonstrate a causal link.  For example, in *Blanding v. Pennsylvania State Police*, the plaintiff claimed that his supervisor's recommendation and the decision of his superiors to discharge him were based on a report submitted by another employee, Marakovits, whom the court accepted was biased.  *Blanding v. Penn. State Police*, 12 F.3d 1303, 1309 (3d Cir. 1994).  Marakovits' report misrepresented facts regarding the plaintiff, however, the court stated that the report "consisted of narrative summaries of what he did and what he had been told by the persons he had interviewed . . . .  It does not comment, or pass any judgment, upon the credibility of Blanding or any other person interviewed."  *Id.*  Because the plaintiff failed to show a connection between the errors in the report (and therefore Marakovits' bias) and the discharge decision, the court granted summary judgment for the employer.  Finally, in *Porter v. Illinois Department of Children and Family Services*, the court found that the plaintiff's supervisor, Williams, had exhibited racial bias.  Although Williams had no authority to discharge the plaintiff, she had instigated the process to discharge him and prepared an unfavorable written evaluation of his performance.  Nevertheless, the court granted the employer's motion for summary judgment because the plaintiff failed to

establish a causal relationship between Williams' racial animus and the discharge decision.  The court stated as follows:

> The possibility that Williams played a significant role in plaintiff's termination does not imply that her alleged bias was also a material factor in that discharge. An admission of bias is material only if it is "related to the employment decision in question."  *Fuka v. Thomson Consumer Elecs.,* 82 F.3d 1397, 1403 (7th Cir. 1996).  Plaintiff seeks to forge this causal relationship by suggesting that racial animus led Williams to reject his work-- thus saddling him with an artificially inflated caseload--or to invent the charges against him.  To support these arguments, plaintiff must produce enough evidence to raise an inference that his work was satisfactory or that he was unfairly singled out for discipline. These propositions find absolutely no support in the record.

*(Porter*, 987 F. Supp. at 673.)

Here, the record contains no evidence suggesting that Thompson changed or misrepresented the information she received from Parking Services or that she filtered the facts or presented them in the worst possible light.  Instead, she relayed information about the phone call she had with Parking Services.  As a result, this is not a situation in which the information that Thompson gave Hendricks is suspect because it may have been a product of bias.  Therefore, Plaintiff has failed to establish a nexus between Thompson's bias and Hendricks' decision to discharge Plaintiff.  *See Cowan*, 123 F.3d at 443-44 (stating that discriminatory statements unrelated to challenged employment decision are not direct evidence of causation) (citing *Furr v. AT & T Tech., Inc*., 824 F.2d 1537, 1549 (10th Cir. 1987)).

Plaintiff could also establish a nexus by showing that Thompson withheld information from Hendricks.  Plaintiff has testified that, in September 1997, Thompson told him he could park in both lots and therefore, either he (with Thompson's permission) or Thompson wrote both parking lot numbers on the tag.  Both Thompson and Hendricks have testified that Thompson had no authority to authorize Plaintiff to park in both lots.  Nevertheless, accepting as true Plaintiff's testimony that Thompson told Plaintiff that he could park in the ILIR lot, then Thompson apparently withheld that information from Hendricks when she reported on what Parking Services had told her.

To conclude that Thompson was motivated by racial animus when she failed to tell Hendricks this information in April, the Court must infer that she set Plaintiff up in September 1997 by giving him inaccurate information, and then sprang the trap in April 1998 after Plaintiff innocently took his parking tag to Parking Services when the tag ripped.  Such a scenario goes well beyond the kind of evidence that constitutes a "convincing mosaic" sufficient to defeat summary judgment based on direct evidence.  As the Seventh Circuit has stated, "[a] little common sense is not amiss in a discrimination case."  *Wallace*, 103 F.3d at 1400.

Moreover, Plaintiff testified that when the unauthorized tag came to light in April, Thompson was irate with him because she had gone out "on a limb" for him in September when she "basically falsified the information on the application" herself.  (Brewer dep., pp. 75-76.) Plaintiff's testimony regarding Thompson's reaction undermines his argument that Thompson was motivated by racial animus when she reported to Hendricks and implies instead that she was worried about getting in trouble because she falsified the parking tag.

Plaintiff also testified that Hendricks told him she did not think the parking tag incident merited his termination but she was concerned about the PSO's relationship with Parking Services.  (Brewer dep., pp. 76-77.)  This evidence shows that Hendricks was motivated by political reasons, not racism, when she terminated Plaintiff's work assignment.  Thus, it does not support Plaintiff's argument that Thompson's alleged racism influenced Hendricks' decision. Whether Hendricks ought to have terminated the assignment based on political motives is not up to the Court.  The Seventh Circuit has repeatedly held that courts do not "sit as a super-personnel department that reexamines an entity's business decision and reviews the propriety of the decision."  *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) (affirming summary judgment for the employer in a Title VII action).

A plaintiff constructing a circumstantial case of discriminatory intent under the direct method of proof must produce "a 'convincing mosaic' of circumstantial evidence" that points

26

"directly to a discriminatory reason for the employer's action."  *Sartor v. Spherion Corp*., 388 F.3d 275, 278 (7th Cir. 2004) (quoting *Troupe*, 20 F.3d at 737).  The circumstantial evidence on which Plaintiff relies here does not create a convincing mosaic of circumstantial evidence sufficient to defeat summary judgment based on direct evidence.

## 2.  Indirect Evidence

Defendant next argues that Plaintiff has failed to present indirect evidence that establishes a *prima facie* case of discrimination.

To establish a *prima facie* case of race discrimination in employment under the indirect method, a plaintiff must show the following:  (1) he is a member of a protected class; (2) his performance met the defendant's legitimate expectations; (3) he suffered an adverse employment action; and (4) the defendant treated other similarly-situated persons outside of the plaintiff's classification more favorably.  *Bratton v. Roadway Package Sys. Inc.,* 77 F.3d 168, 176 (7th Cir. 1996) (citing *McDonnell Douglas,* 411 U.S. at 802).  If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged action.  *Id.*  Once the defendant does so, the burden of production shifts back to the plaintiff to prove by a preponderance of the evidence that the reason proffered by the defendant is actually a pretext for discrimination.  *Id.*

Plaintiff is an African-American, therefore, he satisfies the first element of the *McDonnell Douglas* test.  Furthermore, the termination of his work assignment and assistantship

constitutes an adverse employment action.[2]  However, Defendant contends that (1) the undisputed evidence shows that Plaintiff failed to meet PSO's legitimate performance expectations; (2) Plaintiff has failed to identify a similarly-situated person that PSO treated more favorably; and (3) Plaintiff has failed to provide evidence to show that Defendant's proffered reason for terminating his assistantship was a pretext for discrimination.

### a. Defendant's Legitimate Expectations

Regarding the second element, Defendant contends that Plaintiff failed to meet his employer's legitimate performance expectations based on Plaintiff's failure to meet deadlines, his attendance record, and also because Plaintiff allegedly falsified the parking tag.

In response, Plaintiff argues that Defendant's criticism of his failure to meet deadlines was not a *legitimate* expectation.  In support, he stated that Hendricks did not oversee Plaintiff or set his schedule and she did not remember whether Plaintiff failed to meet deadlines.  Plaintiff also stated that he set his own deadline for the survey report and completed the project only three days after the deadline that he had set.  He stated that Judy Baker, the individual overseeing the project, had no problem with the brief extension.  Plaintiff also contends that the alleged deadline and attendance problems are irrelevant for purposes of the legitimate performance expectations analysis, in part because Thompson and Hendricks testified that Plaintiff was terminated from the PSO only for the parking tag incident and not for any performance issues.

---

[2]Plaintiff also contends that the communication between PSO and ILIR constitutes an adverse employment action.  The Court disagrees.  An adverse employment action is a significant change in the claimant's employment status such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits.  *Rhodes*, 359 F.3d at 504.  Plaintiff has presented no evidence or argument that the communication at issue affected his employment status.

On one hand, Plaintiff argues that Defendant terminated him for reasons of performance issues as well as the proffered reason related to the parking tag.  On the other hand, Plaintiff contends that any evidence related to attendance and failure to meet deadlines is irrelevant because Hendricks' proffered reason for discharging him was unrelated to his performance.  It is undisputed that PSO considered Plaintiff's performance "less than satisfactory" after the first semester.  (*See* January 1998 letters from Feuille and LeRoy to Plaintiff.)  However, the Court agrees that Hendricks testified that she terminated Plaintiff's assistantship solely because of the parking tag incident.  Therefore, the Court will not consider other performance issues at this time.

Regarding the parking tag, Plaintiff apparently argues that the parking tag incident does not constitute a failure to meet legitimate expectations because he acted consistent with Thompson's instructions.  He first argues that he did not alter the parking tag; later in the same paragraph, he states that he "included the ILIR lot on the tag" and claims that was consistent with Thompson's instructions.  (#26, pp. 36-37.)  He also states that PSO had hang tags that were used to permit individuals to park in lots other than the PSO lot, including the ILIR lot; and Thompson gave Plaintiff the tag at the beginning of the fall semester and told him he could park anywhere he needed to park, including the ILIR lot, as long as he was on PSO business.  In support of his argument that the parking tag incident does not constitute a failure to meet legitimate expectations, Plaintiff also refers to Hendricks' alleged statement that she did not believe the parking tag issue warranted termination.

The evidence is disputed whether Plaintiff altered the tag and if so, whether he did so because Thompson told him he could park in the ILIR lot.  Therefore, Plaintiff has raised a question of fact regarding whether he met the PSO's expectations.

29

### b.  Similarly-Situated Individuals

Defendant next argues that Plaintiff has failed to establish that a similarly-situated assistantship-holder outside his protected class was treated more favorably.

In his response, Plaintiff addresses this element of the *prima facie* analysis only in terms of his participation in the ILIR program.  (*See* #26, pp. 42-43.)  As Plaintiff notes, "a student's performance in an assistantship is entirely distinct from the student's academic status."  (#26, p. 43.)  Plaintiff's presentation of evidence related to students who were similarly situated to him in terms of the ILIR program does not constitute evidence of a similarly-situated individual for purposes of his Title VII claim.  *See Bio v. Fed'l Express Corp.*, 424 F.3d 593, 596 (7th Cir. 2005) ("A similarly situated employee is one who is 'directly comparable to [the plaintiff] in all material respects.'").

"The failure to establish any one of the initial four elements defeats a discrimination claim."  *Id.* at *4.  Because Plaintiff has failed to provide any evidence of individuals who were similarly situated to him in terms of his assistantship, he has failed to establish a *prima facie* case of racial discrimination related to the termination of his assistantship by the indirect method. Therefore, the Court grants Defendant's motion for summary judgment on his claim of race discrimination in employment.

### c.  Pretext

Although not necessary to its decision, the Court will also consider the evidence regarding pretext.  If a plaintiff establishes a *prima facie* case of discrimination (which the Court assumes for purposes of this discussion), the defendant bears the burden of offering a legitimate, nondiscriminatory reason for the adverse employment action (in this case, terminating Plaintiff's PSO assignment) and showing that it honestly believed those reasons, even if the reasons are foolish, trivial, or baseless. *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 984 (7th Cir. 1999).  To demonstrate pretext, the plaintiff "must produce" (quoting *King v. Preferred Technical Group,*

166 F.3d 887, 892 (7th Cir. 1999)).  A pretext for discrimination means "a lie, specifically a phony reason for some action."  *Millbrook v. IPB, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002) (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995).  Pretext is "more than an unusual act; it means something worse than a business error, 'pretext' means deceit used to cover one's tracks."  *Id.* (quoting *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005 (7th Cir. 2001)).


Plaintiff states that he has raised a genuine issue of material fact with regard to whether Defendant's proffered reason for terminating his assistantship was a pretext for race discrimination.  In support, he refers generally to the sections of his memorandum on direct evidence in both the assistantship and the ILIR context, similarly-situated individuals, and whether he met PSO's legitimate performance expectations in both contexts, and he provides statistical information about minorities in the ILIR program.  Given the standard for establishing pretext, these general references are not very helpful nor do they constitute "significantly probative admissible evidence."  *See Jones v. Union Pac. R.R. Co.,* 302 F.3d at 742-43.  Thus, Plaintiff has failed to raise a genuine issue of material fact regarding pretext.


### C.  Analysis Regarding the Title VI Claim (Count IV)

Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  The framework for establishing discrimination under Title VI is similar to the method used for Title VII; under Title VI, a plaintiff may prove discrimination by presenting either direct or indirect evidence of discriminatory intent.  *See Lerner v. Ravenswood Hosp. Med. Ctr.*, No. 98 C 5389, 1999 WL 1267710, *4 (N.D. Ill. Nov. 10, 1999) (unreported) (citing *Hankins v. Temple Univ.,* 829 F.2d 437, 440-43 (3d Cir. 1987) (applying *McDonnell Douglas* method of proof to Title VI case)).

In Count IV, Plaintiff alleges that he was denied the benefits of continued participation in the ILIR master's degree program on the basis of his race. Defendant argues that the Court should grant summary judgment in its favor on this claim because Plaintiff has failed to establish a *prima facie* case of racial discrimination based on either direct or indirect evidence.

## 1. Direct Evidence

In his discussion of direct evidence, Plaintiff relies on the following evidence: (1) ILIR faculty and PSO employees, including Wallace Hendricks and Peter Feuille, repeatedly referred to the fact that Plaintiff was the "first African American male" to have PSO/ILIR assistantship (Brewer dep., pp. 84-86); (2) Professor Hendricks often told Plaintiff how important it was for Plaintiff to do well on behalf of the Institute and "future ILIR students," which Plaintiff understood to mean "future African American students" (Brewer ex., #25, p. 12); (3) Plaintiff believed he was subject to extraordinary scrutiny because of his race (Brewer dep., pp. 86-88); and (4) Plaintiff stated that Professor Feuille said he had "ruined it for everyone" and Plaintiff understood that to mean that Feuille was referring to future African-American students (Brewer dep., p. 89). Plaintiff also refers to Paragraphs 59-65 of his additional material facts, which provide evidence regarding grading. Plaintiff does not explain how the facts alleged in those paragraphs constitute direct evidence that Feuille dismissed Plaintiff from the ILIR program based on race.

Plaintiff's assumption that Hendricks and Feuille were referring to African-American's when they talked about future ILIR students is mere speculation and the evidence does not support it. For example, Feuille's letter of April 21, 1998, states as follows:

> The words in this letter cannot fully convey how greatly disappointed, dismayed, and upset we are with your performance. ILIR has worked for many years to establish and maintain a strong relationship with PSO. This relationship has resulted in an annual RA position that has enabled several of your predecessors to obtain the financial aid necessary to pursue a graduate education, as well as provide them with the opportunity to obtain some professionally relevant and valuable work experience. However, with your unacceptable behaviors you have placed this strong relationship in jeopardy, to the possible detriment of the

students who will follow you into our program.  In short, your work behavior has
diminished the reputation of the Institute and your fellow students.

(Feuille letter to Plaintiff dated April 21, 1998.)  Plaintiff has pointed out that he was the first
African-American to hold the PSO assistantship, therefore, Feuille's reference to Plaintiff's
"predecessors" clearly is not limited to African-Americans.  Similarly, there is no indication that
Feuille was referring only to African-American students when he referred to "students who will
follow" Plaintiff in the ILIR program and PSO assistantship.  Plaintiff's speculation does not
constitute direct evidence of discriminatory motive.


        In his discussion on direct evidence, Plaintiff first states without discussion that the
evidence described above, together with other comments, constitutes direct evidence of
discrimination.  Alternatively, he contends that this evidence could lead a reasonable fact-finder
to conclude that the ILIR routinely treated African-Americans as a separate subgroup based on
their race.  At most, these neutral comments might indicate that ILIR treated African-Americans
as a separate subgroup.  However, they do not constitute direct evidence that Plaintiff was
dismissed from the ILIR program because of his race.  *See Phaup*, 761 F. Supp. at 564 (in the
Title VII context, concluding that certain benign statements did not constitute direct evidence of
discrimination, but might serve as indirect evidence of pretext).  Thus, Plaintiff has not presented
direct evidence to support his claim of discrimination under Title VI.


### 2.  Indirect Evidence

        To establish a *prima facie* case of race discrimination under Title VI using the indirect
method, a plaintiff must show the following:  (1) he is a member of a protected class; (2) his
performance met the defendant's legitimate expectations; (3) he suffered an adverse action; and
(4) the defendant treated other similarly-situated persons outside of the plaintiff's classification
more favorably.  *Lerner*, 1999 WL 1267710, at *6.  If the plaintiff establishes a *prima facie* case,
the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the
challenged action.  *Id.*  Once the defendant does so, the burden of production shifts back to the

plaintiff to prove by a preponderance of the evidence that the reason proffered by the defendant is actually a pretext for discrimination.  *Id.*

It is undisputed that Plaintiff was a member of a protected class and that he was dismissed from the ILIR master's degree program.  Thus, Plaintiff has satisfied the first and third elements.  Defendant contends that Plaintiff has failed to satisfy the second and fourth elements and has failed to show that Defendant's proffered reason for dismissing him was pretext. Specifically, Defendant contends that (1) Plaintiff's argument that he met Defendant's legitimate expectations for the master's program fails because his GPA was below the required 3.0 after two semesters; (2) Plaintiff has failed to provide evidence that similarly-situated persons outside his protected class were treated more favorably; and (3) even if Plaintiff succeeds in establishing a *prima facie* case, he has failed to establish that Defendant's proffered nondiscriminatory reasons for dismissing Plaintiff from the program were a pretext for racial discrimination.

Plaintiff contends that he has presented sufficient evidence to establish the existence of genuine issues of material fact that preclude summary judgment.  Specifically, Plaintiff contends that genuine issues of material fact exist as to (1) whether Plaintiff met the legitimate expectations of the ILIR, (2) whether Plaintiff has identified similarly-situated persons outside his class who were treated more favorably, and (3) whether Defendant's proffered reasons for dismissing him from the ILIR program were a pretext for race discrimination.

### a.  Defendant's Legitimate Expectations

Defendant contends that Plaintiff did not meet the ILIR's legitimate expectations because his GPA of 2.959 after two semesters fell short of the ILIR's requirement of a 3.0 GPA.

Plaintiff's response discusses his excellent qualifications and heavy course load.  He states that he was doing quite well academically until the end of the fall semester after

34

Thompson began making disparaging remarks to Denise Hendricks, who is married to Professor Hendricks, an ILIR faculty member. Plaintiff also states that Feuille and Hendricks are close friends. Plaintiff asserts that "[i]t is clear that Plaintiff's alleged performance problems at the PSO were communicated repeatedly to ILIR faculty members, and that numerous discussions were had among faculty members and between the Hendricks' [(*sic*)] regarding Plaintiff." Plaintiff also states that the grading process is subjective. He states that Professor LeRoy often grants extensions and does not always assess penalties. He discusses his grades in Professor Martocchio's classes. Plaintiff then states that the ILIR guidelines allow for exceptions to dismissal for students with a GPA less than 3.0. Plaintiff states that his cumulative GPA after two semesters was very close to 3.0 and he has a learning disability. Plaintiff does not explain how this information is related to the issue of whether he met the ILIR's legitimate expectations. Plaintiff also questions the Committee's decision to dismiss him, and states that the Committee improperly considered his PSO assistantship performance in recommending dismissing him.

Based on this recitation, Plaintiff may be attempting to indicate that his grades were sabotaged as a result of the communication between PSO and ILIR faculty. His statement that he was "doing well academically until the end of the fall semester when Thompson began making disparaging remarks about him to Denise Hendricks" (#26, ¶ 38) implies that Thompson's comments to Denise Hendricks affected the grades that he received from Professors Martocchio and LeRoy for first semester classes. The only evidence that Plaintiff has offered to support this speculation is that his grades declined as the semester progressed. Martocchio testified that he had no contact whatsoever with anyone at PSO; that a student's assistantship performance would have no effect on his academic status; and that he never heard anything about Plaintiff falsifying a parking tag. (Martocchio dep., pp. 33-34, 37.) Regarding his grades in LeRoy's classes, Plaintiff requested extensions on finals due in two classes for Professor LeRoy. LeRoy allowed the extensions but expressly informed Plaintiff that he would assess a penalty on those finals. Based on this evidence, Plaintiff has failed to show a connection between his grades and communications between ILIR and PSO. It is undisputed that the grading process has a subjective component. Furthermore, university instructors are accorded

great deference in evaluating a student's performance.  *See Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 225 n.11 (1985).  Therefore, the Court concludes that Plaintiff has failed to raise a factual dispute regarding whether any alleged communication between PSO and ILIR affected his grades.


Plaintiff concedes that, at the end of the second semester, his GPA was 2.959.  Nevertheless, he appears to contend that the 3.0 GPA requirement was not legitimate *as to him* because he had a learning disability, he was 0.041 from a 3.0 GPA after taking eight courses in two semesters, he had already been offered a prestigious post-graduate job, and he needed to complete only two classes in order to graduate.  Thus, Plaintiff's discussion regarding this element appears to challenge the legitimacy of the GPA requirement.  He has not developed this argument, nor has he presented any facts to support it.  Although the Court has found no case law addressing the legitimacy of expectations in the Title VI context, the Seventh Circuit's approach to this issue in the Title VII context is helpful.  In considering the question of qualifications, the court stated as follows:

> What the qualifications for a position are, even if those qualifications change, is a business decision, one courts should not interfere with.  *Dale v. Chicago Tribune Co.,* 797 F.2d 458 (7th Cir. 1986).  We do not tell employers what the requirements for a job must be.  Given the qualifications which Eagle set out for the position, Gorence simply did not measure up.

(*Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 765 (7th Cir. 2001)).  The Court adopts this approach to the question of the legitimacy of expectations in the Title VI context.  Here, the GPA requirement was not inherently discriminatory.  Beyond that, the Court will not question the decision of the graduate school or the ILIR to establish a certain GPA as a program requirement for its students.


Plaintiff also seems to be arguing that his professors and the Committee did not exercise discretion in his favor.  That is, although he acknowledges that grading is subjective, he seems to believe that his professors should have given him a break when determining grades because he took a heavy load the first semester and because he had a learning disability.  Similarly, he

36

seems to indicate that the Committee should have exercised its discretion in his favor because his GPA was close to the required GPA, because he had a learning disability, because he had already been offered a job, and because he only needed two classes to graduate.  However, Plaintiff has provided no evidence showing that the Committee's exercise of discretion in his case was tainted by improper motives.

Here, it is undisputed that the ILIR Handbook states that a student must maintain a GPA of 3.0.  After Plaintiff's first semester, his GPA was 2.866.  After his second semester, his cumulative GPA was 2.959.  Thus, it is undisputed that Plaintiff failed to meet ILIR's legitimate expectations.

### b.  Whether Plaintiff was Treated Less Favorably Than Similarly-Situated Students

Regarding the fourth element, Plaintiff has presented evidence relating to an Asian-American female student who was dismissed from the ILIR program because her GPA was below 3.0 at the end of two semesters.  (Feuille dep., p. 35.)  The student appealed the dismissal, and as a result of the appeal, Feuille learned that she had followed incorrect advice from a faculty member.  (Feuille dep., p. 34-35.)  Because her failure to achieve a 3.0 average in the second semester was the result of a mistake on the part of an ILIR faculty member, Feuille rescinded the dismissal and allowed her to return to the ILIR program.  Plaintiff contends that he, like that student, relied on the mistaken advice of a faculty member–that being Professor LeRoy's approval of his five-unit course load.

Defendant first distinguishes the situation with the Asian-American student because, in that situation, the reversal occurred as the result of the student's appeal.  In contrast, Plaintiff failed to appeal his dismissal.  In response, Plaintiff states that the fact of the appeal is irrelevant because Feuille testified that he reversed his decision "when the misunderstanding came to his attention."  (#26, p. 49.)  Thus, Plaintiff implies that Feuille learned of the mistake separately from the appeal, and the appeal itself was not a necessary element of the reversal.  Plaintiff has

mischaracterized Professor Feuille's testimony.  Feuille expressly testified that he learned about the additional information "because the student raised it in her appeal."  (Feuille dep., p. 34.)

Plaintiff also argues that he and the Asian-American student were similarly situated in that they both failed to achieve the required GPA because they relied on the mistaken advice of a faculty member.  The Court disagrees.  Plaintiff contends that LeRoy's approval of a five-course load was a mistake "not because of Plaintiff's ultimate performance, but because such an arrangement should never be approved."  (#26, p. 49.)  This is a reference to LeRoy's testimony that Professor Feuille admonished LeRoy for approving Plaintiff's five-unit course load.  LeRoy went on to testify that, as a matter of policy, students are discouraged from signing up for five classes.  (LeRoy dep., p. 104, stating that "the consistent message . . . is [that] students take four units, you don't sign them up for five units, you don't approve student requests for five units, and you never approve a plan in which a student is going to graduate from the program in two semesters rather than three.")  Professor Feuille also testified that the ILIR handbook discourages students from taking five courses in a semester, but it does not prohibit it; instead, individual advisors determine whether it is appropriate in a given case.  (Feuille dep., pp. 28-29.)

Here, however, Plaintiff requested that LeRoy approve a five-unit course load for fall semester as part of his goal to complete the ILIR program in one calendar year.  (LeRoy dep., pp. 16-17.)  The normal load consists of ten courses taken over a year and a half.  A schedule of five units per semester and a schedule allowing completion of the program within a calendar year require the approval of an academic advisor.  LeRoy testified that he approved Plaintiff's request to take five courses during the fall semester in order to try to complete the program within a calendar year.  He stated:

> I was supportive of it because the vision he painted for me of being a very
> successful individual, and I saw in our conversations just superficial sorts of
> indicators that this is a person in whom can you invest this kind of trust and faith
> that this was an individual for whom we could do this kind of exception to the
> norm.

(LeRoy dep., pp. 102-3.)  Notwithstanding LeRoy's approval of the five-unit course load, LeRoy did not "advise" Plaintiff to take five courses.  Instead, Plaintiff voluntarily chose to take five units.  Therefore, unlike the Asian-American student, Plaintiff did not rely on mistaken advice from LeRoy.  A similarly-situated individual is one who is "directly comparable to [the plaintiff] in all material respects."  *Bio*, 424 F.3d at 596 (quoting *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)).  Here, Plaintiff's decision to take five courses did not constitute reliance on mistaken advice of a faculty member.  Thus, Plaintiff has failed to establish that he was situated similarly to the Asian-American student.

Plaintiff also contends that the parking tag incident constituted a situation in which he mistakenly relied on advice from a faculty (or staff) member, and he states that student assistantship issues should not be considered in analyzing whether a student is similarly situated academically.  He testified that he told Feuille about the parking tag incident which he contends was a "misunderstanding," *i.e.*, a mistake, presumably by Thompson.  The parking tag problem arose at the end of April 1998, long after first semester grades were recorded and near the end of the second semester.  Plaintiff has not explained how that incident relates to his grades nor has he presented any supporting evidence.  Plaintiff has also failed to present any evidence to support his suggestion that the parking tag incident influenced Feuille's decision to dismiss him from the ILIR program.  Professor Feuille made the final decision to dismiss Plaintiff from the ILIR program.  Although Feuille clearly knew about the problems with Plaintiff's performance at the PSO and knew that Denise Hendricks had terminated Plaintiff's work assignment at PSO, Feuille has stated that he considered only Plaintiff's GPA when deciding to dismiss Plaintiff from the program.  During his deposition, Feuille was asked whether he considered Plaintiff's dismissal from the PSO in making the decision.  He responded as follows:

> No.  He was below 3.0, and the – I mean, it was, again, he had been told, all right, you got to get your cumulative GPA up to this particular level.  He didn't.  And he had been told what the consequence would be if he didn't.  And it was a very straightforward decision made on that basis.

(Feuille dep., p. 42.)  Plaintiff has failed to present any evidence that raises a issue of fact on this issue.

Plaintiff has presented evidence about one student who was allowed to return to the ILIR program after having been dismissed for failure to achieve the required GPA.  For the reasons described above, the Court concluded that this student was not similarly situated to Plaintiff. Accordingly, Plaintiff has failed to present evidence that he was treated less favorably than a similarly-situated individual outside of his protected group.  Because Plaintiff has failed to establish all the elements of a *prima facie* case on his Title VI claim, the Court grants summary judgment in favor of Defendant.  *See Bio*, 424 F.3d at 596 ("The failure to establish any one of the initial four elements defeats a discrimination claim.")

### c.  Pretext

Although not necessary to its decision, the Court will consider briefly the issue of pretext. Plaintiff argues that he has raised factual issues with regard to whether Defendant's proffered reason for dismissing him from the ILIR program was a pretext for race discrimination.  In his discussion, he refers generally to his arguments regarding direct evidence of discrimination in both the assistantship and the ILIR context, similarly-situated individuals, and whether he met PSO's legitimate performance expectations in both contexts.  As the Court has noted, these general references are not very useful for understanding Plaintiff's argument.

In addition, Plaintiff states that approximately fifteen percent of ILIR students are underrepresented minorities, including African-Americans.  He states that six students have been dismissed from the ILIR program in eleven years, including one Asian student, one Asian-American student, two Caucasian students, and three African-American students, including Plaintiff.  Plaintiff contends that those statistics suggest a predisposition on the part of the ILIR to exercise discretion in favor of non-African-Americans.  Plaintiff also states that one Caucasian student stopped showing up for classes after two weeks and did not show up for his assistantship but was subsequently allowed to enroll in the executive MBA program and obtain his MBA. Plaintiff contrasts this with an African-American student who was dismissed from the ILIR program after one semester when he received a grade of C in four of his classes.  Plaintiff states

40

that these facts suggest that African-American students in ILIR were subject to disparate treatment.

Professor Feuille, who made the decision to dismiss Plaintiff, asserts that he did so because Plaintiff's grades did not satisfy ILIR's standards.  To demonstrate  pretext, a plaintiff "must produce 'significantly probative admissible evidence' from which the trier of fact could infer that the [decision-maker's] reason was false and that the actual reason [for the challenged action] was discriminatory."  *Jones,* 302 F.3d at 742-43 (quoting *King,* 166 F.3d at 892). Because the evidence offered by Plaintiff, construed in his favor, does not suggest that Feuille's reason was a pretext for discrimination, Plaintiff has failed to create a genuine issue of fact as to pretext.  Accordingly, the Court grants summary judgment in Defendant's favor on Plaintiff's Title VI claim.

### D.  Analysis Regarding the Retaliation Claim (Count IV)

Plaintiff's claim in Count V alleges that he was subject to adverse actions, including, but not limited to, denial of a previously-approved waiver for a "Research Methods" class, refusal by Professor LeRoy to supervise Plaintiff's independent study in employment law to which LeRoy had previously agreed, and dismissal from the ILIR master's degree program on June 18, 1998. Plaintiff alleges that Defendant did these things in retaliation for his complaints to Ron Bacevich, a Labor Relations Specialist in the PSO, and Denise Hendricks regarding discrimination that preceded or occurred in connection with his discharge from the PSO.

As an initial matter, Plaintiff's claim of retaliation is based on the premise that he complained of racial discrimination to Ronald Bacevich and Denise Hendricks, not that he filed a charge of discrimination with the EEOC.  Although the Court cannot consider the statements in Mr. Bacevich's affidavit as supporting the truth of the matter asserted in those statements, they do provide evidence that Plaintiff complained to Mr. Bacevich about what he perceived to be discriminatory conduct.

In previously-filed documents, Plaintiff has indicated that the retaliation claim in Count V is based on Title VII, which addresses discrimination in employment.  This is consistent with Plaintiff's prayer for relief in Count V, which seeks back pay, front pay, and other compensatory damages related to employment.  A plaintiff may prove retaliation in violation of Title VII by either the direct or indirect method.  Under the direct method, a plaintiff must provide direct evidence that he engaged in protected activity and, as a result, suffered the adverse employment action of which he complains.  *Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1028 (7th Cir. 2004).  In a retaliation claim, the direct method essentially requires direct evidence that, if believed by the trier of fact would prove discrimination without reliance on inference or presumption.  *Hottenroth*, 388 F.3d at 1028.  Because such admissions are rarely made or encountered, the direct method also allows circumstantial evidence to be introduced that would allow "a jury to infer intentional discrimination by the decision-maker."  *Hottenroth*, 388 F.3d at 1028 (citing *Rogers v. City of Chi.,* 320 F.3d 748, 753 (7th Cir. 2003)).

Alternatively, under the indirect method, the *McDonnell Douglas* burden-shifting test applies to a Title VII retaliation claim just as it does to a racial discrimination claim.  *Hunt-Golliday v. Metro. Water Reclamation Dist.,* 104 F.3d 1004, 1014 (7th Cir. 1997).  Using this method, a plaintiff may establish a *prima facie* case by showing as follows:  (1) he engaged in a statutorily-protected activity; (2) he was performing his job satisfactorily at the time of the adverse employment action; (3) he suffered an adverse employment action; and (4) similarly-situated employees who did not engage in protected activity were treated more favorably than he was.  *See Stone v. City of Indianapolis Pub. Utils. Div.,* 281 F.3d 640, 643-44 (7th Cir. 2002).  Once the plaintiff has established a *prima facie* case, the employer can rebut the inference of discrimination by presenting evidence that the adverse action occurred because of a legitimate nondiscriminatory reason, at which time the burden shifts back to the plaintiff to show pretext.  *Id.*  This framework for analysis was developed to clarify the *McDonnell Douglas* burden-shifting framework, and it eliminates the need for a plaintiff to show a causal link between a protected activity and an adverse employment action.  *Hottenroth*, 388 F.3d at 1028 (citing *Rogers,* 320 F.3d at 755).

Defendant argues that Plaintiff cannot prove retaliation using direct evidence because he cannot prove any discrimination at all.  Therefore, he could not have engaged in protected activity by allegedly reporting discrimination.  Defendant has provided no case law to support this premise.  Furthermore, "an actual violation . . . by the employer is not a prerequisite for a retaliation claim; the employee need only have a sincere and reasonable belief that she is challenging conduct that violates Title VII." *Hunt-Golliday,* 104 F.3d at 1014.  Therefore, Plaintiff's retaliation claim does not depend on the underlying complaints of discrimination being meritorious.  Nevertheless, Plaintiff does not argue that he has presented direct evidence of retaliation.

Defendant also contends that Plaintiff cannot establish discrimination by the indirect method because Plaintiff was not performing satisfactorily at the time the alleged adverse actions were taken and he has failed to point out any similarly-situated employees who did not complain of discrimination who were treated more favorably.  In addition, Defendant contends that Plaintiff has failed to establish the existence of a causal relationship because the decisions related to the alleged adverse actions occurred before Plaintiff filed his complaint with the EEOC.  The Court notes that the Seventh Circuit no longer requires the plaintiff to show a causal link.  *See Hottenroth*, 388 F.3d at 1028 (citing *Rogers,* 320 F.3d at 755).

The parties disagree as to whether Plaintiff was performing satisfactorily in his assistantship.  However, the Court need not address that element because Plaintiff's failure to establish the third and fourth elements of a *prima facie* case dispose of this claim.

Regarding the third element of a *prima facie* case, the alleged retaliatory conduct enumerated in Count V included denial of participation in classes and independent study related to the master's degree program, and dismissal from that program.  None of this conduct is related to Plaintiff's employment.  An adverse employment action is one that involves "a quantitative or qualitative change in the terms or conditions of employment." *Haywood v. Lucent Tech., Inc.,*

323 F.3d 524, 532 (7th Cir. 2003). In his complaint, Plaintiff alleged that the adverse actions that occurred in retaliation for his complaints of discrimination were not limited to the enumerated items in Count V. In a separate section of Plaintiff's response, he also contends that the communications between PSO and ILIR constituted adverse actions. However, Plaintiff has not presented any evidence or argument that the communications affected his assistantship. Thus, the communications do not constitute adverse employment actions. Other than this, Plaintiff has not presented evidence or argument regarding any other adverse actions *related to his employment* at the PSO that occurred as a result of his complaints to Bacevich or Hendricks regarding the alleged discrimination.

Regarding the fourth element, Defendant argues that Plaintiff has failed to establish that a similarly-situated individual outside his protected class was treated more favorably. In his response, Plaintiff addresses this factor only in terms of his participation in the ILIR program. (*See* #26, pp. 42-43.) Plaintiff's presentation of evidence related to students who were similarly situated to him in terms of the ILIR program does not constitute evidence of a similarly-situated individual for purposes of the Title VII employment claim.

"The failure to establish any one of the initial four elements defeats a discrimination claim." *Bio*, 2005 WL 2241001, at *4. Because Plaintiff has failed to provide any evidence of conduct that constitutes an adverse *employment* action that occurred in retaliation for his complaints of racial discrimination, or evidence of individuals who were similarly situated to him in terms of his employment, he has failed to establish a *prima facie* case of racial discrimination related to the termination of his assistantship by the indirect method. Accordingly, the Court grants Defendant's motion for summary judgment as to Count V.

**V.  Summary**

For the reasons stated above, the Court **GRANTS** Defendant's Motion for Summary Judgment **(#24).**  This case is terminated.


ENTER this 22nd day of December, 2005.


                                            s/ DAVID G. BERNTHAL

                                            U.S. MAGISTRATE JUDGE